# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

CHRISTINE RENEE STEMPLE,

Plaintiff,

v.

FRANK BISIGNANO,
Commissioner of Social Security,

Defendant.

_______________________________________/

Case No. 1:26-cv-00295-SKO

ORDER ON PLAINTIFF'S SOCIAL SECURITY COMPLAINT

(Doc. 1)

## I. INTRODUCTION

Plaintiff Christine Renee Stemple ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying her application for disability insurance benefits ("DIB") under the Social Security Act (the "Act"). (Doc. 1.) The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

## II. FACTUAL BACKGROUND

On August 26, 2022, Plaintiff filed a claim for DIB payments, alleging she became disabled on May 31, 2020, due to major panic disorder, anxiety, depression, borderline personality with dissociative disorder, and a history of self-harm. (Administrative Record ("AR") 67, 73, 120, 138, 145, 249–58, 317.)

---

[1] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (*See* Doc. 9.)

Plaintiff was born in 1967 and was 52 years old on the alleged disability onset date. (AR 78, 119, 138, 144.) She has at least a high school education and has no past relevant work. (AR 78, 318.)

**A. Relevant Evidence of Record[2]**

**1. Medical Evidence**

In February 2020, Plaintiff presented for treatment of her chronic recurrent major depressive disorder, panic disorder with agoraphobia, and cannabis dependence. (AR 666.) She reported feeling "down and frustrated" over "constant hot flashes" following her hysterectomy. (AR 66.) She also stated that she was "weaning off" her Trazadone and that "she had a better response with Prozac." (AR 666.) Her mental status examination showed a sad mood and restricted affect, and was otherwise normal, with no suicidal ideations or psychotic symptoms. (AR 666.) She was advised to restart Prozac. (AR 666.) That next month, Plaintiff reported "doing very well" and "stable," with "good mood" and normal mental status examination. (AR 669.)

Plaintiff presented for a follow up appointment in June 2020. (AR 609–10.) She again reported "doing very well" and "feeling stable." (AR 609.) She was compliant with medications. (AR 609.) On mental status examination, Plaintiff was cooperative and polite, alert and oriented, with relevant and coherent speech, "really good" mood, broad and appropriate affect, and normal cognitive functions. (AR 609.) She denied suicidal ideations or psychotic symptoms. (AR 609.) Plaintiff was advised to continue her psychiatric medications. (AR 609.)

In October 2020, Plaintiff presented for a follow up visit. (AR 611–12.) She was "doing okay" with stable mood and compliant medications. (AR 611.) Her mental status examination was normal as before. (AR 611.) In January and April 2021, Plaintiff reported being under stress due to her father's cancer treatment, but that she was handling it "well." (AR 613, 615.) She said she feels "stable." (AR 613, 615.) On mental status examination, Plaintiff was casually groomed, cooperative and polite, alert and oriented, with relevant and coherent speech, "okay" mood, broad and appropriate affect, and normal cognitive functions. (AR 613, 615.) She denied suicidal ideations or

[2] Because the parties are familiar with the medical evidence, it is summarized here only to the extent relevant to the contested issues.

psychotic symptoms. (AR 613, 615.) Plaintiff was advised to continue her psychiatric medications. (AR 613, 615.)

Plaintiff complained of worsening anxiety and depression in July 2021. (AR 617–18.) She reported that her father recently passed away. (AR 617.) Plaintiff also stated that she was going to start weekly therapy. (AR 617.) On mental status examination, her mood was anxious and depressed but otherwise normal. (AR 617.) Her psychiatric medication dosage was increased. (AR 617.) That next month, Plaintiff continued to complain about worsening anxiety and depression. (AR 619.) Her mental status examination results were the same as before. (AR 619.)

In August 2021, Plaintiff was hospitalized, after being found unconscious and unresponsive in her car. (AR 406–10.) A drug screen test was positive for amphetamines and THC. (AR 406.) After extubation, Plaintiff recovered and started feeling better but had significant stridor and was anxious. (AR 406.) She left against medical advice with her mother and was discharged in stable condition. (AR 406–407.)

Plaintiff again returned to the emergency department in September 2021, due to altered mental state, respiratory failure and history of polysubstance abuse. (AR 503–504.) She was found unresponsive at home. (AR 504, 522.) She was diagnosed with sepsis, pneumonia, hyperkalemia, hypoxia, and rhabdomyolysis. (AR 528.) It was noted her status at discharge had improved, including intact cognitive status full code of resuscitation status and good rehabilitation potential. (AR 506.) At a telepsychiatry session during her hospitalization, Plaintiff denied that she was attempting suicide and instead took pills to relax. (AR 808–809.)

That same month, Plaintiff reported to her therapist that she took "mystery pills" after feeling "rejected and unloved by her mother" and "was not trying to kill herself and does not want to die." (AR 604.) Patient spoke in an appropriate tone, volume, and rate of speech. (AR 604.) On mental status examination, Plaintiff's behavior, thought processes, thought content, and insight were normal. (AR 604.) Her mood was dysphoric ("confused"), and no suicidal or homicidal ideation was noted or reported. (AR 604.) The therapist referred her to inpatient services, a "higher level of care due to ongoing dangerous behaviors and current eating disorder." (AR 605.)

In October 2021, Plaintiff reported for a follow up appointment with an "okay" mood. (AR

621.) She reported having been "involuntarily admitted to a psychiatric hospital in Merced in August." (AR 621.) Plaintiff noted that she was "doing better now" and no changes to her medications were made. (AR 621.) Plaintiff's mental status examination showed she was casually groomed, cooperative and polite, alert and oriented, with relevant and coherent speech, "okay" mood, broad and appropriate affect, and normal cognitive functions. (AR 621.) Plaintiff was advised to continue her psychiatric medications. (AR 621.)

Plaintiff presented for mental health treatment by Dwight Sievert, M.D., in July and August 2024. She reported that her medication "has made a difference" in her anxiety and she is feeling "less obsessive." (AR 774–77.) Her mental status examinations were normal, with normal mood, orientation, and cognitive function, and no suicidal ideation or psychotic symptoms. (AR 774–77.)

**2. Opinion Evidence**

In January 2022, State agency psychological consultant Tawnya Brode, Ph.D., opined that Plaintiff was able to understand and remember detailed and some complex instructions; she was capable of carrying out detailed and some complex instructions and able to maintain concentration and attention over extended periods for detailed and some complex tasks; she was able to sustain superficial interaction with the public and maintain relationships with coworkers and supervisors; and she was capable of appropriately responding to most predictable changes in the work setting. (AR 132.) Another State agency psychological consultant, Mark Gilson, Ph.D., found in November 2022, that Plaintiff's mental impairments were "not severe" from May 31, 2020, to August 23, 2021, and there was insufficient evidence to evaluate her residual functional capacity from August 24, 2021, through June 30, 2022. (AR 152–54.) In May 2023, yet another State agency psychological consultant, Ryan Hammond, Ph.D., opined that there was insufficient evidence to make an assessment. (AR 141–43.)

Treating psychiatrist Dr. Sievert, along with Samantha Brown, LMFT, completed a "medical residual functional capacity questionnaire" in February 2024. (AR 695–97.) In it, they indicated Plaintiff's performance of the following abilities would be precluded for 15 percent (72 minutes) or more of an eight-hour workday: remember locations and work-like procedures; make simple work-related decisions; interact appropriately with the general public; and to be aware of normal hazards

and take appropriate precautions. (AR 695–96.) They also opined Plaintiff's performance would be precluded for 10 percent (48 minutes) of an eight-hour workday for the following abilities: understand and remember very short and simple instructions and to travel in unfamiliar places or use public transportation. (AR 695–96.) Finally, Plaintiff opined that Plaintiff's limitations would preclude performance for five percent (24 minutes) of an eight-hour workday of the following abilities: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods of time; sustain an ordinary routine without special supervision; ask simple questions or request assistance; and get along with coworkers and peers without distracting them or exhibiting behavioral extremes. (AR 695–96.) In response to the question, "When did these limitations begin?" they responded, "[Plaintiff] reports 15 years ago." (AR 695.) They did not indicate any response to the question, "What is the onset date for the above limitations?" (AR 697.)

**3. Plaintiff's Statements**

In December 2021, Plaintiff completed a function report. (AR 289–96.) She complained of difficulty remembering, completing tasks, concentrating, understanding, following instructions, and getting along with others. (AR 289, 290, 293, 294, 295, 296.) She also complained of anorexia and obsessive-compulsive disorder symptoms. (AR 289, 290, 294.) She reported an inability to lift more than 20 pounds. (AR 294.)

Plaintiff reported that she had no problems with self-care. (AR 290.) She prepared simple meals and did light housework (dishes, laundry, dusting, floors, bathrooms, and remove trash). (AR 291.) According to Plaintiff, she drove a car and went shopping in stores. (AR 292.) She used public transportation, shopped on the computer, handled money, drew, and sewed. (AR 292, 293.)

Plaintiff completed another adult function report in May 2023. (AR 349–57.) She complained of issues with panic attacks, anxiety, social anxiety, and major panic disorder with associated symptoms of shortness of breath, blood pressure elevation, lack of sleep, and a suicide attempt in 2013. (AR 349, 354.) She claimed that she had difficulty remembering, concentrating, focusing, and completing tasks, and that she can only pay attention for two minutes. (AR 354, 356.) She also reported that she cannot handle stress and changes in routine well, but she has no difficulty

getting along with others. (AR 354, 355.)

Plaintiff also reported having some problems with personal care. (AR 350–51.) She prepared simple meals. (AR 351.) She did housework with breaks. (AR 351.) She shopped online and had items delivered. (AR 352.) She did not drive a car. (AR 352.)

**B. Administrative Proceedings**

The Commissioner denied Plaintiff's application for benefits initially on November 28, 2022, and again upon reconsideration on June 26, 2023. (AR 67, 158–61, 169–72.) Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 173–212.) At the hearing on November 19, 2024, Plaintiff appeared by telephone with counsel and testified before an ALJ as to her work history and alleged disabling conditions. (AR 93–112.) A Vocational Expert ("VE") also testified at the hearing. (AR 112–17.)

**1. Plaintiff's Testimony**

Plaintiff testified that she cannot work due to emotional dysregulation and anxiety attacks. (AR 97—98, 110.) She testified that Klonopin helped with anxiety, but it created a dependency, and she had built up a tolerance to Prozac. (AR 109–110.) She stopped both medications in 2022. (AR 109–110.)

According to Plaintiff, she visits her parents and does their dishes. (AR 99.) She also runs errands for her mother. (AR 99.) Plaintiff testified she drove alone to San Francisco to attend to the settling of her late brother's estate. (AR 101, 103.) She shops at stores like Walmart and Dollar Tree once per week. (AR 100.) Plaintiff testified that her hobbies are sewing and making flower bouquets. (AR 101.) She can make her own sewing patterns and can follow a sewing pattern. (AR 102.)

**2. Vocational Expert's Testimony**

The ALJ asked the VE to consider a person of Plaintiff's age and education. (AR 113.) The VE was also to assume this person had no exertional limitations, but she has the following non-exertional limitations: she can understand, remember, and carry out simple instructions; can occasionally interact with coworkers, supervisors, and the public; and can deal with occasional changes in a routine work setting. (AR 113.) The VE testified that such a person could perform

medium exertional jobs in the national economy such as stores laborer, Dictionary of Operational Titles (DOT) code 922.687-058, with a specific vocational preparation (SVP)[3] of 2; industrial cleaner, DOT code 381.687-018, with an SVP of 2; and hand picker, DOT code 920.587-018, with an SVP of 2.

Considering a second hypothetical, where a person would have the same limitations as the first but cannot interact with the public or perform tasks that require teamwork or work done in tandem, the VE testified that the previously identified work would be available. (AR 113–114.) According to the VE, considering a third hypothetical involving the same limitations in the second hypothetical but also limited to medium exertional work and frequently handling, fingering, and feeling with the bilateral upper extremities, the positions of stores laborer and industrial cleaner would be available. (AR 114.)

The VE considered a fourth hypothetical, where an individual is limited to medium work; can understand, remember, and carry out simple instructions; occasionally interact with coworkers, supervisors, and the public; deal with occasional changes in a routine work setting; and limited to frequent handling, fingering, and feeling with the bilateral upper extremities. (AR 116.) The VE testified that such a person could perform the positions of stores laborer and industrial cleaner, as well as campground attendant, DOT code 329.683-010, with an SVP of 2. Finally, the VE testified that an employer would tolerate no more than 15% off-task time and two absences a month. (AR 114.)

**C. The ALJ's Decision**

In a decision dated December 23, 2024, the ALJ found that Plaintiff was not disabled, as defined by the Act. (AR 67–80.) The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 404.1520. (AR 69–80.) The ALJ decided that Plaintiff met the insured status requirements of the Act through June 30, 2022, and she had not engaged in substantial gainful activity during the period between May 31, 2020, the alleged onset date, through the date last insured of June 30, 2022

---

[3] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991). Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation). *Id.*

(step one). (AR 69.) At step two, the ALJ found Plaintiff's following impairments to be severe since May 31, 2020: borderline personality disorder, dysthymic disorder, major depressive disorder, panic disorder, cannabis dependance, obsessive compulsive disorder, and anxiety disorder. (AR 69–70.) Beginning on April 20, 2022, Plaintiff had the following severe impairments: lateral epicondylitis of both elbows, borderline personality disorder, dysthymic disorder, major depressive disorder, panic disorder, cannabis dependance, obsessive compulsive disorder, and anxiety disorder. (AR 69–70.) Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (step three). (AR 70–73.)

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[4] and applied the assessment at steps four and five. *See* 20 C.F.R. § 404.1520(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity . . . . We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps."). The ALJ determined that Plaintiff had the RFC prior to April 20, 2022:

> to perform a full range of work at all exertional levels but with the following non-exertional limitations: she could understand, remember, and carry out simple instructions; she could occasionally interact with coworkers, supervisors, and the public; and she could deal with occasional changes in routine work setting.

(AR 73–77.) The ALJ further found that beginning on April 20, 2022, through June 30, 2022 (the date last insured), Plaintiff's mental impairments in the RFC remained the same, but she was limited to "medium work as defined in 20 CFR [§] 404.1567(c), except she could frequently handle, finger, and feel with her bilateral upper extremities." (AR 77–78.) Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms[,]" the ALJ rejected Plaintiff's subjective testimony as "not entirely consistent with the medical evidence and

---

[4] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. TITLES II & XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, Social Security Ruling ("SSR") 96-8P (S.S.A. July 2, 1996). The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.* "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

other evidence in the record for the reasons explained in [the] decision." (AR 78.)

The ALJ determined that Plaintiff had no past relevant work (step four) but, given her RFC, she could perform a significant number of jobs in the national economy (step five), including stores laborer, industrial cleaner, and campground attendant. (AR 78–80.) The ALJ concluded Plaintiff was not disabled at any time from May 31, 2020, the alleged onset date, through June 30, 2022, the date last insured. (AR 80.)

Plaintiff sought review of this decision before the Appeals Council, which denied review on November 26, 2025. (AR 1–6.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 404.981.

## III. LEGAL STANDARD

### A. Applicable Law

An individual is considered "disabled" for purposes of disability benefits if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). However, "[a]n individual shall be determined to be under a disability only if [their] physical or mental impairment or impairments are of such severity that [they] are not only unable to do [their] previous work but cannot, considering [their] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520). The Ninth Circuit has provided the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity. If so, the claimant is not disabled. If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments. If not, the claimant is not disabled. If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1. If so, the claimant is automatically presumed disabled. If not, the ALJ proceeds to step four and assesses whether the claimant is capable of

> performing [their] past relevant work. If so, the claimant is not disabled. If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy. If so, the claimant is not disabled. If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

"The claimant carries the initial burden of proving a disability in steps one through four of the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)). "However, if a claimant establishes an inability to continue [their] past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work." *Id.* (citing *Swenson*, 876 F.2d at 687).

**B. Scope of Review**

"This court may set aside the Commissioner's denial of [social security] benefits [only] when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at 1097 (citation omitted). "Substantial evidence . . . is 'more than a mere scintilla,'" and means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). *See also Ford v. Saul*, 950 F.3d 1141, 1154 (9th Cir. 2020).

"This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). "The ALJ's findings will be upheld if supported by inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citation omitted). Additionally, "[t]he court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Id.*; *see, e.g.*, *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) ("If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner." (citations omitted)).

Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a

specific quantum of supporting evidence.'" *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)). "Rather, a court must 'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006)). Harmless error "exists when it is clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006)). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted).

## IV. DISCUSSION

Plaintiff contends that the ALJ erred in their assessment of the medical opinion of Dr. Sievert/LMFT Brown, the ALJ failed to articulate clear and convincing reasons for discounting her testimony regarding her subjective complaints, and the RFC lacks the support of substantial evidence. (Docs. 11, 14.) The Commissioner responds that the RFC is free from error, the ALJ's consideration of the medical opinion was proper and supported by substantial evidence, and the ALJ properly relied on evidence in the record that undermined the credibility of Plaintiff's allegations of disabling symptoms and limitations. (Doc. 13.) The Court finds no harmful error in the ALJ's decision and will affirm.

### A. The ALJ's Treatment of Dr. Sievert/LMFT Brown's Opinion Was Not Erroneous

#### 1. Legal Standard

An ALJ "cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence. The agency must 'articulate . . . how persuasive' it finds 'all of the medical opinions' from each doctor or other source" and "explain how [it] considered the supportability and consistency factors' in reaching these findings." *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022) (citing 20 C.F.R. § 404.1520c(b)). The SSA regulations provide that the most important factors to consider when evaluating the

persuasiveness of medical opinions are "supportability" and "consistency." 20 C.F.R. § 404.1520c(a). Supportability refers to "the extent to which a medical source supports the medical opinion by explaining the 'relevant... objective medical evidence.'" *Woods*, 32 F.4th at 791–92 (quoting 20 C.F.R. § 404.1520c(c)(1)). Consistency refers to "the extent to which a medical opinion is 'consistent...with the evidence from other medical sources and nonmedical sources in the claim." *Id*. at 792 (quoting 20 C.F.R. § 404.1520c(c)(2)).

*Woods* makes clear that to properly reject a medical opinion under the substantial evidence standard, the ALJ "must articulate how persuasive it finds all the medical opinions from each doctor or other source and explain how it considered the supportability and consistency factors in reaching these findings." *Id*. (quoting 20 C.F.R. § 404.1520c(b)).

**2. Analysis**

The ALJ determined that the opinion of Dr. Sievert and LMFT Brown was "not persuasive for the relevant period because they did not begin treating [Plaintiff] until after the date last insured." (AR 76.) The ALJ further found that the opinion was "inconsistent with [Plaintiff's] varied activities and unsupported by the objective findings." (AR 76.)

"[W]hile post-[date last insured] evidence cannot be rejected solely as remote in time, it can be rejected on the grounds that the evidence itself is not retrospective." *Boucher v. Colvin*, No. C13–47–MAT, 2013 WL 3778891, at *2–3 (W.D. Wash. July 18, 2013); *Morgan v. Colvin*, No. 6:12-CV-1235-AA, 2013 WL 6074119, at *10 (D. Or. Nov. 13, 2013) ("[I]t is well-established that an ALJ may reject a medical opinion, even that of a treating doctor, where it was completed . . . years after claimant's date last insured and was not offered as retrospective analysis.") (citation omitted); *C.f. Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228 (9th Cir. 2011) (determining that the ALJ erred by failing to consider a doctor's opinion that post-dated the ALJ's decision because the opinion concerned the claimant's limitations during the relevant period). Here, Plaintiff does not establish that the opinion was offered retrospective to a time prior to her date last insured of June 30, 2022. Plaintiff does not argue—and nor does the record show—that Dr. Sievert or LMFT Brown treated or evaluated Plaintiff prior to 2023 (*see* AR 695). The opinion is silent as to the "onset date for the above limitations." (*See* AR 697.) While Dr. Sievert and LMFT Brown did complete the question

"When did these limitations begin?", their response, "[Plaintiff] reports 15 years ago" (AR 695) was according to ***Plaintiff's*** view, not theirs. *See Alvarez v. Comm'r of Soc. Sec.*, No. 1:20-CV-01207-SAB, 2022 WL 3108619, at *10 (E.D. Cal. Aug. 4, 2022), *aff'd sub nom. Alvarez v. Kijakazi*, No. 22-16497, 2023 WL 7982622 (9th Cir. Nov. 17, 2023) (finding the ALJ's according "little weight" to a "remote to the date last insured" medical opinion was supported where the opining physician "reported that the date on which all of the identified limitations first began was 'per patient more than 10 years [ago]' and did not "indicate he endorse[d] Plaintiff's reporting or otherwise opines her reported symptoms or limitations related back to the relevant period."). Thus, the ALJ reasonably concluded that the opinion of Dr. Sievert/LMFT Brown was not supported during the relevant period. *See Stephanie T. v. Comm'r of Soc. Sec.,* No. 6:21-CV-01738-AA, 2023 WL 8096890, at *6 (D. Or. Nov. 21, 2023) (upholding ALJ's conclusion that opinion was not supported where treatment occurred after the relevant period and opinion did not reflect the plaintiff's function during the relevant period); *Callahan v. Kijakazi*, 657 F. Supp. 3d 1368, 1382 (E.D. Cal. 2023) (finding ALJ's determination of non-persuasiveness proper where the plaintiff did not "establish that Dr. McDonald rendered her opinion retrospective to a period prior to Plaintiff's date last insured in June 2019."). *See also Watkins v. Astrue*, 357 Fed. App'x. 784, 786 (9th Cir. 2009) (affirming rejection of treating physician's opinion offered after the plaintiff's insured status expired and the "questionnaire [was] written in the present tense" and "made no indication" it was retroactive); *Melynda G. v. Kijakazi*, No. 5:20-CV-00890-JC, 2022 WL 911585, at *5 (C.D. Cal. Mar. 29, 2022) ("[O]pinions provided after the date last insured may indeed be given less weight on this basis, particularly where such opinions do not appear to concern the earlier period at issue. That is true here. There is nothing in Dr. Ries's opinion to suggest that it referred to the relevant period in 2016.") (internal citations omitted); *Kelly K. K. v. Berryhill*, No. CV 17-08124-RAO, 2018 WL 5734591, at *12 (C.D. Cal. Oct. 31, 2018) ("The ALJ noted that Dr. Ishaaya's April 2016 opinion was dated long after September 30, 2014, Plaintiff's date last insured, and the opinion "is not indicative of her functioning during the period in question." Indeed, when asked to state the earliest date that these limitations apply, Dr. Ishaaya failed to provide a date. This is another valid reason for rejecting Dr. Ishaaya's opinion.") (internal citations omitted); *Capobres v. Astrue*, No. CV 1:09-

682-REB, 2011 WL 1114256 (D. Idaho Mar. 25, 2011) (ALJ did not err in rejecting opinion because it was outside relevant period and not controlling or persuasive before the date last insured, nearly two and half years earlier, where the opinion was not offered as retrospective to the relevant period).

As to consistency, the ALJ found the opinion of Dr. Sievert/LMFT Brown was inconsistent with the other evidence of record, including her activities of daily living, normal examination results, and improvement and stabilization with medication. (AR 76.) These findings are supported by substantial evidence. The ALJ noted the inconsistency between the opined limitations and Plaintiff's performance of activities during the relevant period, including handling self-care, preparing simple meals, doing housework, driving a car, shopping in stores, using public transportation, handling money, and traveling to San Francisco to attend to the settling of her late brother's estate. (AR 76, 290–93.) Such degree of regular activities belies Dr. Sievert's and LMFT Brown's opinion, particularly that Plaintiff would be unable to remember locations, make simple work-related decisions, and interact with the public for 15% (72 minutes) or more of the workday (*see* AR 695–96). *See Morgan v. Comm'r of Soc. Sec. Admin*., 169 F.3d 595, 601–603 (9th Cir. 1999) (upholding ALJ decision discounting doctors' opinions based in part on the plaintiff's activities of daily living).

Mental status examinations during the relevant period also undermine the opined limitations, documenting that Plaintiff denied suicidal ideations or psychotic symptoms, had some anxiety and depression but was cooperative and polite, alert and oriented, with relevant and coherent speech, otherwise normal mood, broad and appropriate affect, and normal cognitive functions. (AR 604, 609, 611, 613, 615, 617, 619, 621.) *See Morgan*, 169 F.3d at 600–601 (9th Cir. 1999) (The ALJ may accord an opinion less weight based upon substantial evidence, including "clinical evidence" that the ALJ finds to be conflicting.); *Alvarez*, 2022 WL 3108619, at *10 ("[T]he ALJ's finding that the symptoms noted in [the physician's] opinion are not supported by the medical record for the relevant period constitutes a specific and legitimate reason to discount his opinion."). The record also contains instances where Plaintiff reported that her medication was producing a "better response" (AR 666) and that she was doing "very well" or "better" and "feeling stable" as a result (AR 609, 611, 621, 669). *Cf. Warre v. Comm'r*, 439 F.3d 1001, 1006 (9th Cir.

2006) ("Impairments that can be controlled effectively with medication are not disabling for purposes of determining eligibility for [Social Security] benefits.").

Plaintiff does not dispute this evidence, which is supported by the record. Instead, she asserts that it does not undermine Dr. Sievert's and LMFT Brown's opinion.[5] (Doc. 11 at 10–11.) Plaintiff's disagreement lies with the ALJ's interpretation of the medical evidence, yet it is not within the province of this Court to second-guess the ALJ's reasonable interpretation of that evidence, even if it could give rise to inferences more favorable to Plaintiff. *See Molina*, 674 F.3d at 1110; *Andrews v. Shalala*, 53 F.3d 1035, 1039–40 (9th Cir. 1995) ("The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities. We must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation.") (citations omitted). *See also Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004) ("When the evidence before the ALJ is subject to more than one rational interpretation, [the Court] must defer to the ALJ's conclusion.").

In sum, it was reasonable for the ALJ to conclude that the severe restrictions opined by Dr. Sievert and LMFT Brown were unpersuasive considering the date of the opinion and the record as a whole. That the opinion did not concern the relevant period and was inconsistent with the medical record was legally sufficient based on the substantial evidence cited.

**B. The ALJ Properly Found Plaintiff Less Than Fully Credible**

**1. Legal Standard**

In evaluating the credibility of a claimant's testimony regarding subjective complaints, an ALJ must engage in a two-step analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged. *Id*. The claimant is not required to show that [their] impairment "could reasonably be expected to cause the severity of the symptom [they have] alleged; [they] need only show that it could reasonably have caused some degree of the symptom." *Id*. (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th

[5] For example, Plaintiff suggests that her medical improvement occurred entirely after the date last insured (Doc. 11 at 10), but the medical evidence shows otherwise. (*See* AR 609, 611, 621, 666, 669.)

Cir. 2007)). If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if they give "specific, clear and convincing reasons" for the rejection.[6] *Id.* As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

*Tommasetti*, 533 F.3d at 1039 (citations and internal quotation marks omitted); *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226–27 (9th Cir. 2009). Other factors the ALJ may consider include a claimant's work record and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains. *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

The clear and convincing standard is "not an easy requirement to meet," as it is "'the most demanding required in Social Security cases.'" *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014) (quoting *Moore v. Comm'r of Social Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)). General findings are not enough to satisfy this standard; the ALJ "'must identify what testimony is not credible and what evidence undermines the claimant's complaints.'" *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)).

**2. Analysis**

As noted above, the ALJ found Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms," but rejected Plaintiff's subjective testimony as "not entirely consistent with the medical evidence and other evidence in the record . . . ." (AR 78.) In view of this finding, the only remaining issue is whether the ALJ provided "specific, clear and convincing reasons" for Plaintiff's adverse credibility finding. *See Vasquez*, 572 F.3d at 591.

Here, the ALJ made a reasonable determination based on specific, clear, and convincing evidence that Plaintiff's allegation of "disability due to major panic disorder, anxiety, depression,

[6] The Court rejects the Commissioner's contention that a lesser legal standard applies. (*See* Doc. 13 at 6 n.1.)

borderline personality with dissociative disorder, and history of self-harm" was inconsistent with her admitted activities of daily living. (AR 73–74, 76–77.) An ALJ may consider "whether the claimant engages in daily activities inconsistent with the alleged symptoms." *Lingenfelter*, 504 F.3d at 1040. Even if the claimant experiences some difficulty or pain, her daily activities "may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." *Molina*, 674 F.3d at 1113.

Plaintiff reported that she handled her personal care, prepared simple meals, did light housework (dishes, laundry, dusting, floors, bathrooms, and remove trash), drove a car (including alone to San Francisco to attend to the settling of her late brother's estate), went shopping online and once a week at stores like Walmart and Dollar Tree, used public transportation, visited her parents, ran errands for her mother, handled money, drew, sewed (including using a premade pattern and a pattern of her own making), and made flower bouquets. (AR 99, 100, 101, 102, 103, 290, 291, 292, 293, 351, 352.) The ALJ reasonably concluded that these activities undermined Plaintiff's allegations of "difficulty remembering, completing tasks, concentrating, understanding, following instructions, and getting along with others" (AR 74). *See Kaufmann v. Kijakazi*, 32 F.4th 843, 851–52 (9th Cir. 2022) ("Looking to the entire record, substantial evidence supports the ALJ's conclusion that Claimant's testimony about the extent of her limitations conflicted with the evidence of her daily activities, such as sewing, crocheting, and vacationing."); *Ahearn v. Saul*, 988 F.3d 1111, 1117 (9th Cir. 2021) (the plaintiff's "ability to play video games and watch television for sustained periods, to use a library computer a few times a week for two hours at a time (the maximum time permitted by the library), to use public transportation, to shop at stores, to perform personal care, to prepare meals, to socialize with friends, and to perform household chores" provided "substantial evidence" to support the ALJ's decision.); *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (affirming an ALJ's decision discounting a claimant's testimony after finding that the claimant "was able to perform various household chores such as cooking, laundry, washing dishes, and shopping").

Plaintiff, citing Ninth Circuit authority, primarily faults the ALJ for failing to "connect these activities to specific statements by Plaintiff that she found not credible." (Doc. 11 at 12–13 (citing *Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th Cir. 2015)); *see also* Doc. 14 at 3 (citing *id*. and

*Lambert v. Saul*, 980 F.3d 1266, 1278 (9th Cir. 2020)).) However, in *Lambert*, the Ninth Circuit held that its "cases do not require ALJs to perform a line-by-line exegesis of the claimant's testimony, nor do they require ALJs to draft dissertations when denying benefits." *Id.* at 1277. Moreover, the ALJ here did not merely provide a summary of the medical evidence. Unlike *Lambert* and *Brown-Hunter*, the ALJ here detailed Plaintiff's allegations of "difficulty remembering, completing tasks, concentrating, understanding, following instructions, and getting along with others" and contrasted that testimony with opposing evidence from the medical record documenting the performance of certain activities of daily living. (AR 73–74, 76–77). The identification of specific allegations and the reported activities that undermine those allegations permits the Court to review the ALJ's reasoning. Plaintiff's argument is therefore unavailing. *See Guthrie v. Kijakazi*, No. 21-36023, 2022 WL 15761380, at *1 (9th Cir. Oct. 28, 2022) (rejecting the plaintiff's argument that "the ALJ legally erred by failing to clearly identify which portions of his symptom testimony she rejected and failing to link her rejection of that testimony to the record evidence," where the ALJ "sufficiently explained her reasons for discounting [the plaintiff's] symptom testimony, and we can easily follow her reasoning and meaningfully review those reasons.") (citing *Kaufmann*, 32 F. 4th at 851); *see also Smartt v. Kijakazi*, 53 F.4th 489, 499 (9th Cir. 2022) ("The standard isn't whether our court is convinced, but instead whether the ALJ's rationale is clear enough that it has the power to convince."); *Razaqi v. Kijakazi*, No. 1:20-CV-01705-GSA, 2022 WL 1460204, at *5 (E.D. Cal. May 9, 2022) ("The ALJ did not necessarily match each piece of evidence with the testimony it purportedly undermined, but no controlling precedent requires that level of specificity. No inferential leaps are required to find the ALJ's reasoning clear and convincing.").

Plaintiff's remaining criticisms (that her activities were "necessary," "sporadic," limited to a "clinical or administrative interview," or performed with "significant limitations," Doc. 11 at 13) are directed to the ALJ's interpretation of the evidence, which the Court will not disturb, given its reasonableness.[7] *See Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (citing *Fair v. Bowen*,

---

[7] The ALJ did, for example, note that Plaintiff took "breaks" when performing household chores and had "some problems" with personal care. (AR 74.) And the ALJ's observation (at step two) that Plaintiff at the hearing was "able to keep up with the pace of questioning" and "maintain sufficient concentration to understand and answer questions asked of her" (AR 72) was a proper factor to consider. *See Nyman v. Heckler*, 779 F.2d 528, 531 (9th Cir. 1986) (when an ALJ includes personal observations of a claimant during the hearing, the decision is not improper if other evidence

885 F.2d 597, 604 (9th Cir. 1989)). In view of the inconsistency between her activities and her allegations of disabling impairments, as identified by the ALJ, the Court finds that the ALJ's analysis of Plaintiff's subjective statements and testimony is supported by proper legal analysis and substantial evidence.

**C. Substantial Evidence Supports the Mental RFC Assessment**

**1. Legal Standard**

A claimant's residual functional capacity assessment is a determination of what the claimant can still do despite their physical, mental and other limitations. 20 C.F.R. § 404.1545(a). The residual functional capacity is the "maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs." 20 C.F.R. Part 404, Subpt. P, App. 2, § 200.00(c). In determining a claimant's residual functional capacity, an ALJ must assess all the evidence to determine what capacity the claimant has for work despite the impairment(s). 20 C.F.R. § 404.1545(a); *Valentine*, 574 F.3d at 690 (a residual functional capacity that "fails to take into account a claimant's limitations is defective"). Therefore, an ALJ errs when they provide an incomplete residual functional capacity ignoring "significant and probative evidence." *Hill v. Astrue*, 698 F.3d 1153, 1161-62 (9th Cir. 2012).

The residual functional capacity does not need to directly correspond to a specific medical opinion; rather, "the ALJ is responsible for translating and incorporating clinical findings into a succinct [residual functional capacity]." *Rounds v. Comm'r of Soc. Sec. Admin*., 807 F.3d 996, 1006 (9th Cir. 2015). ALJs are capable of independently reviewing and forming conclusions about medical evidence to determine whether a claimant is disabled and cannot work, as required by statute. *Farlow v. Kijakazi*, 53 F.4th 485, 488 (9th Cir. 2022). The ALJ's residual functional capacity assessment should be affirmed if the ALJ has applied the proper legal standard and the decision is supported by substantial evidence in the record. *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005).

---

supports the determination); *see also Drouin v. Sullivan*, 966 F.2d 1255, 1258-59 (9th Cir. 1992) (observations of ALJ during the hearing, along with other evidence, is substantial evidence for rejecting testimony).

**2. Analysis**

Plaintiff first contends that the RFC was the result of the ALJ improperly imposing their own lay interpretation of "raw medical data" because it "does not correspond to any medical opinion in the record." (Doc. 11 at 14.) This argument is unavailing. It is well established that the ALJ's RFC determination need not mirror any particular provider's opinion. *See e.g.*, *Petrini v. Berryhill*, 705 F. App'x. 511, 512 (9th Cir. 2017); *Rounds*, 807 F.3d at 1006; *Turner v. Comm'r Soc. Sec.*, 613 F.3d 1271, 1223 (9th Cir. 2010). The nature of the ALJ's responsibility is to interpret the evidence of record, including medical evidence. *Andrews*, 53 F.3d at 1039. Such a responsibility does not result in the ALJ committing legal error when they assess an RFC that is consistent with the record. *See Mills v. Comm'r of Soc. Sec.*, No. 2:13-CV-0899-KJN, 2014 WL 4195012, at *4 (E.D. Cal. Aug. 22, 2014) ("[I]t is the ALJ's responsibility to formulate an RFC that is based on the record as a whole, and thus the RFC need not exactly match the opinion or findings of any particular medical source.") (citing *Magallanes v. Bowen*, 881 F.2d 747, 753 (9th Cir. 1989)). *See also* 20 C.F.R. § 404.1545(a)(1) ("We will assess your residual functional capacity based on all the relevant evidence in your case record."); *id.* § 404.1546(c) ("[T]he administrative law judge . . . is responsible for assessing your residual functional capacity.").

Here, the ALJ considered the opinions of Dr. Sievert and LMFT Brown (discussed above) and the State agency physicians. (AR 75–76.) The ALJ, as they are charged to do, then analyzed the persuasiveness of those opinions, and rejected all except the opinion of State agency psychological consultant Dr. Brode, who opined that Plaintiff was able to understand and remember detailed and some complex instructions; she was capable of carrying out detailed and some complex instructions and able to maintain concentration and attention over extended periods for detailed and some complex tasks; she was able to sustain superficial interaction with the public and maintain relationships with coworkers and supervisors; and she was capable of appropriately responding to most predictable changes in the work setting. (AR 132.) The ALJ found this opinion "somewhat persuasive"—a determination Plaintiff does not challenge—in light of the longitudinal record,

ultimately formulating an RFC with greater limitations than those opined.[8] (AR 75.) These additional restrictions further accounted for Plaintiff's impairments based on her hearing testimony that she traveled to San Francisco to attend to the settling of her brother's estate, and she helped her parents. (AR 75.) The ALJ also considered treatment records indicating that Plaintiff "requires medication in order to stabilize her mood." (AR 75.) The ALJ was entitled to review and interpret this evidence—none of it constituted "raw medical data." *See Ann M. v. Berryhill*, No. 5:18-CV-01080-KES, 2019 WL 1171160, at *6 (C.D. Cal. Mar. 12, 2019) ("Contrary to the cases cited by Plaintiff, the records in this case provided the ALJ with ample support for his RFC, which was based not on raw data but on treatment notes, which included Plaintiff's subjective complaints, observations by physicians, and the treatment plans.") (internal quotation marks omitted); *Mills,* 2014 WL 4195012, at *4 (finding argument that the ALJ was improperly attempting to "play doctor" lacked merit where the ALJ "carefully analyzed the various medical opinions, treatment records, and plaintiff's own testimony in formulating an RFC.").

Plaintiff asserts further that "the evidence the ALJ did credit supports greater limitations than the RFC reflects," citing the ALJ's findings at step three that Plaintiff had "moderate" limitations in concentrating, persisting, or maintaining pace and in interacting with others.[9] (Doc. 11 at 15; *see also* Doc. 14 at 5.) The Court finds, contrary to Plaintiff's argument, that the ALJ reasonably accommodated these moderate limitations into the RFC by limiting her to simple instructions, occasional interaction with others, and occasional changes in a routine work setting. *See Shaibi v. Berryhill*, 883 F.3d 1102, 1107 (9th Cir. 2017) (finding "no obvious inconsistency" between the two physicians' opinions that plaintiff was "moderately limited" in his interactions with coworkers and the ALJ's RFC finding that limited plaintiff to "simple routine tasks in a non-

---

[8] As such, any error would therefore be inconsequential to the disability determination. *See Lamas v. Saul*, No. 1:19-cv-00852-BAM, 2020 WL 6561306, at *9 (E.D. Cal. Nov. 9, 2020) (holding that although ALJ erred in evaluating a claimant's RFC without support from a medical opinion, such error was harmless where the ALJ found more stringent limitations than any medical opinion). *See also Johnson v. Shalala*, 60 F.3d 1428, 1436 n.9 (9th Cir. 1995) ("[T]his overinclusion of debilitating factors is harmless simply because if a person can do a job that requires increased concentration, the claimant is also capable of performing work that requires less concentration.").

[9] Plaintiff also points to her testimony and that of her parents (Doc. 11 at 14), yet none of which was "credited" by the ALJ. (*See* AR 76–77 (Third party statements by Plaintiff's mother and father "not consistent with [Plaintiff's] testimony"); AR 78 (Plaintiff's subjective testimony "not entirely consistent with the medical evidence and other evidence in the record . . . .").)

public setting, with occasional interactions with coworkers”); *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1173–74 (9th Cir. 2008) (ALJ’s limitation to “simple, routine, repetitive” work sufficiently accommodated medical opinion evidence that plaintiff had “moderate” limitation in pace and “other mental limitations regarding attention, concentration, and adaptation”); *Hughes v. Colvin*, 599 Fed. App’x 765, 766 (9th Cir. 2015) (ALJ’s RFC assessment accounted for moderate difficulties in social functioning, concentration, and persistence by restricting plaintiff to simple, routine, repetitive tasks in job where she could work independently, with no more than occasional public interaction); *Solano v. Saul*, No. 1:19-CV-1351 JLT, 2021 WL 792735, at *5 (E.D. Cal. Mar. 2, 2021) (limitation to “occasional” interaction with coworkers in the RFC addressed a physician’s opinion that the claimant had moderate limitations with interacting with peers and coworkers). Plaintiff may disagree with the RFC, but the Court must nevertheless uphold the ALJ’s determination because it is a rational interpretation of the record that is supported by substantial evidence. *See Ford*, 950 F.3d at 1159; *Thomas*, 278 F.3d at 954.

## V. CONCLUSION AND ORDER

After consideration of Plaintiff’s and Defendant’s briefs and a thorough review of the record, the Court finds that the ALJ’s decision is supported by substantial evidence and is therefore AFFIRMED. The Clerk of Court is DIRECTED to enter judgment in favor of Defendant Frank Bisignano, Commissioner of Social Security, and against Plaintiff.

IT IS SO ORDERED.

Dated: **July 14, 2026**

/s/ *Sheila K. Oberto*
UNITED STATES MAGISTRATE JUDGE